OCTOBER TERM, 1882, No. 157.            OCTOBER 23, 1882.

## The Braddock Ferry Company's Appeal.

1. The right to keep and maintain a public ferry belongs to every
riparian owner, so long as it does not conflict with any exclusive grant.
2. The limitation of three thousand feet, provided by section 31 and
section 32 of the act of April 29, 1874, P. L., p. 73, within which a
ferry company has exclusive privileges, is annulled by the subsequent
act of April 17, 1876, P. L., p. 30.

Before SHARSWOOD, C. J.; MERCUR, GORDON, PAXSON,
TRUNKEY, GREEN, and CLARK, JJ. STERRETT, J., absent.

Appeal of the Braddock Ferry Company from a decree
of the Court of Common Pleas No. 1 of *Allegheny County*,
dismissing a bill in equity.

The bill filed by The Braddock Ferry Company against
Anna Sharp and John Sharp set forth that the Brad-
dock Ferry Company, by its charter, approved April 29,
1874, was empowered to establish and maintain a skiff,
flatboat, rope, chain, or steam ferry across the Monon-
gahela river, between Braddock's, on the north side,
and Kenny's landing, on the south side of said river; that
the said corporation established a ferry, and provided a
safe and commodious steamboat for travel between the
said points; that it had also leased a landing belonging
to Thomas Fawcett, immediately adjoining Kenny's land-
ing, for the convenience of the public; that the defend-
ants, since plaintiff's incorporation, without any license
or authority of law, had established a ferry from Brad-
dock's to Fawcett's landing; that the route of said ferry
established by defendants is within three thousand feet
of the route of plaintiff's ferry at both termini; that de-
fendant's ferry is without authority of law, and is in

violation of plaintiff's rights, privileges, and franchises, as conferred by its charter and the laws of Pennsylvania.

The bill prayed for an injunction.

The defendants in their answer admitted that they maintained a skiff ferry from Braddock's to Fawcett's landing, but denied that it had been established since the complainant's incorporation, and denied that the landing at Fawcett's is within three thousand feet of the landing at Kenny's. They denied also that they were in any way violating the complainant's rights and privileges.

The Court appointed J. S. Cook as master, who filed a report, finding as follows:

"First. The Braddock Ferry Company was incorporated in April, 1879, and its articles of association duly recorded in that month, with the purpose, as therein stated, of 'establishing and maintaining a skiff, flatboat, rope, chain, or steam ferry across the Monongahela river, between the borough of Braddock, on the north side, and Kenny's landing, on the south side of said river.'

"Second. John Sharp, deceased, the husband of Ann Sharp, one of the defendants, and father of John Sharp, the other defendant, in the fall of 1874 or spring of 1875, established for the use of the public a skiff ferry, extending from a point at the foot of Eighth street, in the borough of Braddock, across the Monongahela river to a point on what is known as Fawcett's landing, and operated it continuously, giving it all his time and attention until he died, in February, 1882. He procured the right to land from the owner of Fawcett's landing, and in operating the ferry used one skiff, and sometimes two when necessary. This ferry, so established and operated, had no charter.

"Third. After the death of John Sharp, in February of 1882, John Sharp, one of the defendants, began to operate the ferry of his father for the benefit of his mother, the other defendant, and has continued to do so to the present time. He has carried it on between the same points, using one skiff continuously, and two when necessary.

"Fourth. The Braddock Ferry Company, when incorporated, established a skiff ferry for passengers and a flatboat for teams from a point at the foot of Eleventh street, in said borough, to what is known as Kenny's landing, on the south side of the river, and procured a lease from the owner of the landing of a part thereof, which included one hundred feet of the river front. . . . Said ferry company also established a steam ferry, the

boat running from Braddock, at the foot of Eleventh street, down the river to Homestead, on the south side of the river, touching at Kenny's, Fawcett's, and other landings when business required.

\*     \*     \*     \*     \*     \*     \*

"The distance between the points at which the respective ferries actually land on the south side of the river is less than three thousand feet, but plaintiff has not affirmatively shown that the distance between Sharp's ferry and the portion it leased from Kenny for a landing is less than three thousand feet; and while the testimony as to where the one hundred feet of river front is located is very conflicting, yet it is clear that the ferry company does not land on that portion described in the lease from Kenny, but some distance below and toward Sharp's landing.

"The plaintiff seeks to enjoin defendants from operating their ferry, and alleges that it is maintained and operated without authority of law and in violation of plaintiff's rights as conferred by charter. Defendants allege their right to operate and continue their ferry, and deny that they interfere with the rights of plaintiff acquired by its charter.

"It may be conceded that plaintiff has no rights superior to defendants, unless its charter from the State gave it such. The defendants are not operating their ferry in a different manner from that done since it was first established, and not operating it between different points.

"It may also be conceded that defendants have the right to land their skiffs at the points they do land them, and to cross and recross said river to these points, unless the plaintiff, by procuring its charter and establishing its ferry, acquired rights which rendered the rights of defendants to operate their ferry unlawful.

"The master is of opinion that the distance of three thousand feet which plaintiff claims is not the measure of its right, and that it could not deprive defendants of, or enjoin them from operating, their ferry, on the naked allegation and proof that it was being operated within three thousand feet.

"The Legislature, in providing for the incorporation and regulation of certain corporations, P. L., 1874, page 73, enacted, *inter alia*, in section 31, as follows: 'No bridge or ferry company shall have the right to exercise its corporate franchises within three thousand feet of any other bridge or ferry in actual use at the date of issuing letters-patent to the new corporation.'

"And section 32 of same act: 'Any ferry company in-

corporated as aforesaid shall have the right and power to erect and maintain a ferry, whether of steam-power or otherwise, across any of the streams or waters of this Commonwealth, subject to the rights of prior occupants, within three thousand feet of the point at which the proposed ferry is to be located.'

"An act supplementary to the above, approved 14th of March, 1876, P. L., 1876, page 6, amended that part of section 31 relating to bridges, but did not alter it as to ferries.

"Another supplement to said act, approved the 17th of April, 1876, P. L., 1876, pages 34 and 36, amended section 31, and omitted that part thereof hereinbefore quoted, and amended section 32 to read as follows : 'Any ferry company incorporated as aforesaid shall have the right and power to erect and maintain a ferry, either of steam-power or otherwise, across any of the streams or waters of this Commonwealth, subject to the right of prior occupants.'

" It was evidently the legislative intent to get rid of the limit of three thousand feet. The omission of that part of section 31 relating thereto in the amendment of 17th of April, 1876, indicates this, and when in section 32, as amended, it is again omitted, it becomes apparent that hereafter that limit was not to be the measure of one's right.

" Aside from the distance between the points at which the ferries land, let us inquire what are the rights of plaintiff. It has a right to land at Kenny's landing ; its charter confers that right. It has the right to the occupancy of the river bank to low water line for the distance of one hundred feet, at or near a private road, which is a part and parcel of Kenny's landing ; this it acquired from the owner of the river front for the purpose of a landing. Its duties are commensurate with this right. The right to maintain a ferry with a terminus at Kenny's involves the duty to carry to that point, but it does not involve any duty to carry elsewhere. When it undertakes to carry to Fawcett's, Homestead, or any other landing, it loses the protection afforded by its charter.

"Tripp v. Frank, Fourth Term, Rep. 666 ; Taylor v. Wilmington and Manchester R. R. Co., 4th Jones, 277.

" In Houck on Rivers, section 312, it is confidently asserted that no one can set up a ferry without a charter ; and again, that a riparian proprietor, though he own the lands on both sides of a river, cannot, without consent of the State, set up and operate a ferry for the public use.

"In many of the States, from a very early period, ferries have been regulated by statute, the mode of licensing thereof differing in the different States; but we look in vain through the legislation of this State for the doctrine asserted by Houck, or for any judicial recognition thereof. Indeed, the policy of the State seems to have been quite the contrary. While the bed of navigable rivers is presumed to belong to the Commonwealth, the adjoining lands have belonged to the owners of the soil, to appropriate and use as they saw proper, which has been effective to control the rights of embarkation and landing.

"Bird *v*. Smith, 8 W., 434; Cooper *v*. Smith, 9 S. & R., 32.

"Prior to the act of 1874, there was no legislative provision for the chartering of ferries, and charters, when procured, were applied for in many cases after the ferry had been established. The act itself contained the privileges sought for in expressed terms.

"The act of 16th of April, 1863, P. L., 507, expressly refers to the landing of. William McKee, and gives him exclusive rights in the conduct of his ferry, and provides that nothing in the act of incorporation shall interfere with the landing known as Short's ferry landing—a ferry that never had a charter.

"In 1863, P. L., 11, the Legislature granted a charter for a ferry over the Allegheny river at Kittanning, and provided therein that it should not be lawful for any other person to establish a ferry for passengers, &c., between certain points.

"In 1865, P. L. 328, the Jones Ferry Company was granted certain exclusive privileges between the Point and West Pittsburgh. It was operated many years prior thereto by Thomas Jones and his devisees without any charter, and is referred to in the act of Assembly mentioned as the Jones Ferry.

"Special enactments, such as these, comprised all the legislation on the subject of ferries prior to 1874. There was no general legislation on the subject, and the conclusion to be drawn is, that the right to keep and maintain a public ferry belonged to every riparian owner, so long as it did not conflict with any exclusive grant. The paucity of exclusive grants over the Monongahela, Allegheny, and Ohio rivers, compared with the number of ferries we know to be maintained over these streams, leads to the irresistible conclusion that the right to maintain a public ferry was and is common to all, and restricted only when

interfering with special grants ; otherwise, the river was and is a highway of wrong-doers.

"The Legislature, by its act of 1874, in providing for the chartering of ferries, requires the association of five (5) or more persons. It certainly did not intend that all these ferries now maintained at every bend in our rivers, without charters, were bound to comply with this enactment; otherwise, to be without the protection of the law. Such has not been the policy of the State. She has recognized these unlicensed ferries. She has done so expressly in her numerous special enactments on that subject, and her policy in relation thereto has been such that we must conclude that the language of the act of 1874, 'subject to the rights of prior occupants,' was meant to protect the unlicensed as well as the licensed ferry.

"It was contended that even if Thomas Sharp had rights in his lifetime which the law would protect, they ended with his life. It is not such rights that die with the person. The right of Thomas Sharp to carry passengers between Eighth street and Fawcett's landing, across the Monongahela river, is co-extensive with his rights in these landings, and would descend to his heirs and next of kin at his death.

"The master, therefore, in view of the findings and conclusions herein set forth, recommends that plaintiff's bill filed in this case be dismissed, and that the plaintiff pay the costs."

The complainant filed exceptions, which the Court below, September 30, 1882, overruled, and it made a decree dismissing the bill.

The complainant thereupon took this appeal, assigning for error the decree of the Court.

*Knox & Reed* and *J. S. Ferguson*, for appellant.

We think the limitation of three thousand feet still exists in the statutes. The act of April 17, 1876, in terms only amended the act of April 29, 1874. It did not strike down or destroy the act of March 14, 1876. Shinn *v.* Com.. 3 Grant, 205.

We further contend, that it was clearly established that the distance between the ferries on the south side of the river was less than three thousand feet.

In this country, ferries are controlled by the State. A riparian proprietor, though he own the land on both sides of a river, without the consent of the State, cannot set up and operate a public ferry, and levy ferriage or tolls.

Bell *v.* Clegg, 25 Ark., 26 ; Blissett *v.* Hart, Willes' Rep.,

[The Braddock Ferry Company's Appeal.]

512; Young *v.* Harrison, 6; Georgia, 131; Nashville *v.*
Shelby, 10 Yerger, 280; Bird *v.* Smith, 8 Watts, 434; Lans-
ing *v.* Smith, 4 Wend., 21; Cooper *v.* Smith, 9 S. & R., 26;
Trustees *v.* Tatman, 13 Ills., 27; Charles River Bridge
Case, 11 Peters, 620; Murray *v.* Menefee, 20 Ark, 561;
Midland Ferry Company *v.* Wilson, 28 N. J., Eq., 537.

*W. B. Rodgers* for appellee.

Our rights and the rights of the ferry corporation do
not conflict. It was incorporated to carry travelers up
the river to Kenny's; it found us engaged in carrying
them down the river to Fawcett's, and it only came into
competition with us by an abuse of its franchises.

By the policy of this State, evidenced by its statutes
and its judicial decisions, the establishing and maintain-
ing of a public ferry is of common right, being appurte-
nant or incidental to the ownership or control of the nec-
essary landings, and even the original act of 1874, whilst
it protected corporations formed under it from the com-
petition of subsequently-established enterprises, recog-
nized and expressly saved "the rights of prior occu-
pants."

But appellant was incorporated after the amendment
of April 17, 1876, (P. L. 30,) had abolished the exclusive
privilege which it claims; and it has utterly failed to give
any evidence that would sustain a verdict in an action on
the case under the old common law rule, and has there-
fore, *a fortiori*, no right to an injunction.

Tripp *v.* Frank, 4 T. R., 666; Taylor *v.* Wilmington
and Manchester R. R. Co., 4 Jones, 277; Cooper *v.* Smith,
9 S. & R., 32; Bird *v.* Smith, 8 Watts, 434; Charles River
Bridge, *v.* Warren Bridge, 11 Peters, 620.

NOVEMBER 20TH, 1882.—PER CURIAM: We agree en-
tirely in the report and opinion of the learned master in
the Court below, and that the decree, therefore, dismissing
the bill with costs was right.

Decree affirmed and appeal dismissed at the costs of
the appellant.